IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-130

No. 253A20

Filed 5 November 2021

IN THE MATTER OF: A.E., J.V., E.V., A.V.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 27 February 2020 by Judge Marion M. Boone in District Court, Stokes County. This matter was calendared for argument in the Supreme Court on 30 September 2021, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jennifer Oakley Michaud for petitioner-appellee Stokes County Department of Social Services.*

*James N. Freeman, Jr., for appellee Guardian ad Litem.*

*David A. Perez for respondent-appellant mother.*

*Mercedes O. Chut for respondent-appellant father.*

ERVIN, Justice.

¶ 1 Respondent-mother Rosa E. and respondent-father Charles V. appeal from the trial court's orders terminating their parental rights in their minor children J.V., E.V., and A.V.,[1] and respondent-mother appeals from the trial court's order

---

[1] J.V., E.V., and A.V., respectively, will be referred to throughout the remainder of this opinion as "Jake," "Evette," and "Alana," which are pseudonyms used to protect the identity of the juveniles and for ease of reading.

terminating her parental rights in her minor child A.E.[2] After careful consideration of respondent-mother's and respondent-father's challenges to the trial court's termination orders in light of the record and the applicable law, we conclude that the trial court's termination orders should be affirmed.

## I. Factual Background

On 20 February 2018, the Stokes County Department of Social Services received a report alleging that Ellie, Jake, Evette, and Alana lived in a home that was "severe[ly] infest[ed]" with German cockroaches and that Ellie, who was always anxious to eat when she was at school, arrived at school wearing dirty and soiled clothes. The report was accompanied by videos showing the severity of the cockroach infestation that depicted "[a] multitude" of cockroaches in all stages of life crawling up and across all of the surfaces in the home, including the walls, floors, ceilings, counters, cabinets, and kitchen appliances. In the course of investigating the report, the social worker observed that cockroaches were ubiquitous throughout the home and noticed a pile of used diapers by the front door, breakfast cereal scattered around the home, and food-encrusted dishes in the kitchen area. In addition, the social worked observed that two of Alana's front teeth were decaying and that Evette appeared to have an abdominal hernia. On 20 February 2018, DSS filed juvenile

---

[2] A.E. will be referred to throughout the remainder of this opinion as "Ellie," which is a pseudonym used to protect the juvenile's identity and for ease of reading. Ellie's putative father is not a party to this appeal.

petitions alleging that all four children were neglected juveniles who lived in an environment that was injurious to their welfare and were exposed to a substantial risk of physical injury as the result of conditions created by respondent-mother and respondent-father and obtained the entry of orders taking the children into nonsecure custody, a step that resulted in the children's placement in foster care.

¶ 3        After the filing of the original petitions, DSS obtained additional information concerning the children and the conditions in which they lived. Among other things, DSS learned that Ellie had to have her clothes changed on a daily basis following her arrival at school because of their filthy condition and the smell that emanated from them. In addition, the social worker learned that respondent-father allegedly "whopped" Ellie with a "wood[en] board" when she failed to listen to educational personnel. The family had been the subject of five prior DSS reports, having been found in need of services in 2014 in the aftermath of an incident during which Ellie had been left alone in a vehicle for about fourteen minutes while wearing a heavily soiled diaper at a time when the outside temperature was ninety degrees. According to a psychological report, respondent-mother had reduced intellectual functioning and an untreated mood disorder, did not have sound judgment, and lacked "a good sense" of appropriate child development.

¶ 4        Although respondent-mother claimed that Alana had been born with rotten teeth, subsequently obtained medical records disproved that assertion. An

examination of Ellie's medical records reflected concerns relating to inadequate nutrition and a history of asthma. In addition, other medical records revealed that both Ellie and Jake had tested positive for the presence of high levels of lead and that Ellie exhibited "risk factors for lead toxicity." Although the available educational records indicated that, when she was two, Ellie exhibited delays in fine motor skills, she had been identified as being "globally delayed" upon entering kindergarten and was receiving special education services on the basis of an Individualized Educational Plan. In light of this additional information, DSS filed amended juvenile petitions on 8 March 2018 for the purpose of adding allegations that the children had not received proper care, supervision, or discipline from respondent-mother and respondent-father.

¶ 5          On 23 February 2018, respondent-mother and respondent-father entered into case plans in which they agreed to cooperate with an exterminator in connection with the elimination of the cockroach infestation, to dispose of trash and other waste products in an appropriate manner, to receive information concerning the maintenance of appropriate hygiene and to demonstrate a proper understanding of that subject by bathing regularly and maintaining a sanitary home, to attend parenting classes, to obtain a psychological and parenting evaluation and follow all resulting recommendations, and to provide appropriate snacks for and engage in appropriate activities with the children during visits. Respondent-mother and

respondent-father began work toward satisfying the requirements of their case plans immediately.

¶ 6        In a report that was dated 15 March 2018 and had been prepared for use in connection with the initial adjudication and disposition hearing on 22 March 2018, DSS noted that respondent-mother and respondent-father had been cooperating with the exterminator, had begun a fourteen-week parenting class, and had scheduled appointments for the purpose of obtaining a psychological and parenting evaluation. DSS noted that, while respondent-mother had displayed adequate parenting skills and had provided appropriate snacks during visitations, respondent-father had done "very little" during his visits with the children.

¶ 7        On 22 March 2018, respondent-mother and respondent-father stipulated that, at the time that the juvenile petitions had been filed, the children had not been receiving proper care, supervision, or discipline. On 11 May 2018, the trial court entered an order finding that all of the children were neglected juveniles based upon the information to which respondent-mother and respondent-father had stipulated. The trial court instructed respondent-mother and respondent-father to continue to comply with their case plans, allowed them to visit with the children for two hours each week, and established a primary permanent plan for the children of reunification and a secondary permanent plan of legal custody with a relative.

¶ 8        Respondent-mother and respondent-father made some progress toward satisfying the requirements of their case plans prior to the initial review hearing, which was held on 14 June 2018. According to a DSS report dated 6 June 2018, both respondent-mother and respondent-father had completed their psychological and parenting evaluations, neither of which found the conditions of the family home to be unsafe or inappropriate for the children. DSS described the improvements in the condition of the family home as "significant." Finally, DSS reported that respondent-mother and respondent-father had visited with the children "faithfully," were appropriately engaged with the children during the visits, and had completed the required parenting classes.

¶ 9        A report prepared by the guardian ad litem on 7 June 2018, noted, on the other hand, that respondent-mother and respondent-father often ended their visits with the children fifteen minutes early and that they had left a three-hour visit in May 2018 at the two hour mark. In addition, the guardian ad litem indicated that respondent-mother and respondent-father continued to struggle with problems relating to personal hygiene and that they found it difficult to bring appropriate snacks for consumption during visits with the children. Similarly, the guardian ad litem stated that respondent-mother and respondent-father had trouble managing the children and that only respondent-mother attempted to engage with all four children during visits. Finally, the guardian ad litem noted the difficulties that

respondent-mother and respondent-father had in attempting to understand the problems that arose from the existence of the children's special needs. The trial court did not make any changes to the children's permanent plan or the existing visitation arrangements in an order that was entered on 13 July 2018 following the conclusion of the 14 June 2018 review hearing.

¶ 10        In a report prepared prior to a review hearing that was initially scheduled for 23 August 2018 and held on 13 September 2018, DSS pointed out that both respondent-mother and respondent-father had participated in Ellie's appointments and had expressed a willingness to meet with the specialists responsible for Jake and Evette as well. According to DSS, respondent-father had difficulty controlling his emotions when he was confronted with information that he viewed as adverse, including information relating to the children's placements. Although it believed that respondent-mother and respondent-father were continuing to make progress toward satisfying the requirements of their case plans, DSS pointed out that they "need[ed] to demonstrate their ability to consistently address the developmental, care and well-being needs for the children" and "their commitment to the children's safety and their ability to protect the children." In a report relating to the same period of time, the guardian ad litem identified the existence of similar obstacles to the reunification of respondent-mother and respondent-father with the children. The trial court did not make any changes to the primary permanent plan or the existing visitation

arrangements in an order entered on 29 October 2018, but it did change the secondary permanent plan to one of guardianship with a court-approved caretaker.

¶ 11 The progress that respondent-mother and respondent-father were making toward reunification began to stall in 2019. In a report prepared prior to a review hearing that was scheduled for 11 April 2019 and held on 17 May 2019, DSS noted that respondent-mother and respondent-father had failed to attend, or even make inquiry about, appointments and meetings related to the children's health and development. In addition, DSS pointed out that respondent-mother and respondent-father had continued to bring sugary snacks to their visits with the children and allowed the children to eat these snacks off of unhygienic surfaces. DSS stated that respondent-father denied that there was anything wrong with the type of snacks that the children were being provided or the manner in which those snacks were being served and questioned whether any of the children had special needs despite having been provided with information to the contrary. According to DSS, respondent-mother and respondent-father had become less attentive to their own hygiene, with their lack of concern about these subjects being indicative of a failure to demonstrate the ability to use the skills that they had learned during parenting classes and to meet the children's needs and suggesting the appropriateness of a change in the permanent plan for the children from one of reunification to one of adoption. The position espoused by DSS was supported by psychological evaluations of both parents

that had been performed in February 2019, with the guardian ad litem's report relating to the same period of time expressing support for DSS' recommended change to the children's permanent plan. In an order entered on 11 July 2019, the trial court reduced the amount of visitation to which respondent-mother and respondent-father were entitled and changed the permanent plan for the children to a primary plan of adoption and a secondary plan of reunification.

¶ 12 On 12 September 2019, DSS filed motions seeking to have respondent-mother's parental rights in all four children terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and dependency, N.C.G.S. § 7B-1111(a)(6), and to have respondent-father's parental rights in Jake terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1); failure to legitimate, N.C.G.S. § 7B-1111(a)(5); and dependency, N.C.G.G. § 7B-1111(a)(6), and to have his parental rights in Evette and Alana terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and dependency, N.C.G.S. § 7B-1111(a)(6). After a hearing held on 17 January 2020, which neither respondent-mother nor respondent-father attended, the trial court entered orders on 27 February 2020 terminating respondent-mother's and respondent-father's parental rights in the children on the basis of all of the grounds for termination alleged in the termination motions and a determination that the termination of respondent-mother's and

respondent-father's parental rights would be in the children's best interests.[3]

Respondent-mother and respondent-father noted appeals to this Court from the trial

court's termination orders.[4]

## II. Analysis

In seeking relief from the trial court's termination orders before this Court,

respondent-mother and respondent-father challenge many of the trial court's findings

of fact as lacking sufficient evidentiary support or as otherwise legally deficient and

---

[3] The trial court entered separate adjudication orders and separate dispositional orders for each of the four children, resulting in a total of eight termination-related orders. For the sake of clarity, however, we will refer to the adjudication orders that the trial court entered at the conclusion of the termination proceeding as "termination orders" and reserve the expression "adjudication order" for the order in which the trial court determined that the children were neglected juveniles.

[4] In her notice of appeal, respondent-mother states that she is appealing from "the Adjudication and Disposition Orders, entered . . . on January 17, 2020 as same day orders . . . as well as any subsequent formal Adjudication and Disposition Orders." Although the termination hearing was held on 17 January 2020, the trial court's written termination-related orders were entered on 27 February 2020. A notice of appeal is required to "designate the judgment or order from which appeal is taken," N.C. R. App. P. 3(d), with "[c]ompliance with the requirements for entry of notice of appeal [being] jurisdictional[,]" *State v. Oates*, 366 N.C. 264, 266 (2012) (citing *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.,* 362 N.C. 191, 197–98 (2008)). "As such, 'the appellate court obtains jurisdiction only over the rulings specifically designated in the notice of appeal as the ones from which the appeal is being taken.' " *Sellers v. Ochs,* 180 N.C. App. 332, 334, (2006). However, "a mistake in designating the judgment, or in designating the part appealed from if only a part is designated, should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be *fairly inferred* from the notice and the appellee is not misled by the mistake." *Evans v. Evans,* 169 N.C. App. 358, 363 (2005) (quoting *Van Ramm v. Van Ramm*, 99 N.C. App. 153, 156–57 (1990)). In view of the fact that DSS and the guardian ad litem have not moved to dismiss respondent-mother's appeal and have fully participated in the proceedings before this Court, they do not appear to have been misled by respondent-mother's mistake in designating the orders from which she has appealed. As a result, we will address the merits of respondent-mother's appeal.

the extent to which the trial court's findings of fact and the record evidence support the trial court's determination that their parental rights in the children were subject to termination. In conducting a termination of parental rights proceeding, the trial court begins by determining whether any of the grounds for termination delineated in N.C.G.S. § 7B-1111(a) exist. *See* N.C.G.S. § 7B-1109 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f)). "If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage," *id.* at 6, at which it "determine[s] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

¶ 14 We review a trial court's adjudicatory decision for the purpose of "determin[ing] whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019) (citing *In re Moore*, 306 N.C. 394,

403–04 (1982)). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

## A. Respondent-father's arguments

In his brief, respondent-father challenges the majority of the trial court's findings on the basis that they (1) constitute nothing more than recitations of witness testimony, reports, or the trial court's beliefs, (2) lack sufficient evidentiary support, or (3) are overbroad. Respondent-father also challenges the trial court's conclusions that his parental rights in Jake, Evette, and Alana are subject to termination.

### 1. *Challenges to Findings of Fact*

#### a. *Recitations of Testimony, the Contents of Documents, or the Trial Court's Beliefs*

According to respondent-father, Finding of Fact Nos. 15–18 and 21–27 in the termination orders relating to Jake and Evette and Finding of Fact Nos. 15–18 and 21–27 in the termination order relating to Alana constitute mere recitations of witness testimony, reports, or the trial court's beliefs "without an assessment of credibility." As this Court has previously held, "[r]ecitations of the testimony of each witness *do not* constitute *findings of fact* by the trial judge" absent an indication concerning "whether [the trial court] deemed the relevant portion of [the] testimony credible." *In re N.D.A.*, 373 N.C. 71, 75 (2019) (first alteration in original) (quoting *Moore v. Moore*, 160 N.C. App. 569, 571–72 (2003)). In *In re N.D.A.*, the trial court found that the father had "testified that he had 'attempted to set up visits with the

child but could not get any assistance in doing so,' " with the father having argued on appeal that the finding in question constituted nothing more than a recitation of his own testimony, a contention with which this Court agreed given the trial court's failure to indicate whether the relevant portion of the father's testimony was credible. *Id.* As a result, we disregarded the challenged finding of fact in evaluating the validity of the trial court's termination order. *Id.*

¶ 17 After carefully reviewing the trial court's termination orders, we agree with respondent-father that Finding of Fact Nos. 16–18 and 23 in all three termination orders, Finding of Fact No. 24 in the termination order relating to Alana, and Finding of Fact No. 22 in the termination orders relating to Jake and Evette constitute mere recitations of testimony given that each of the challenged findings of fact simply recite that a particular witness either "testified" or "stated" a particular proposition without any indication that the trial court evaluated the credibility of the relevant witness or resolved any contradictions in his or her testimony. As a result, as in *In re N.D.A.*, we will disregard these findings of fact in evaluating the extent to which the trial court properly found that respondent-father's parental rights in the children were subject to termination.

¶ 18 We note, however, that "[t]here is nothing impermissible about describing testimony, so long as the court ultimately makes its own findings, resolving any material disputes," *In re T.N.H.*, 372 N.C. 403, 408 (2019) (quoting *In re C.L.C.*, 171

N.C. App. 438, 446 (2005), *aff'd per curiam, in part, and disc. rev. improvidently allowed, in part*, 360 N.C. 475 (2006)), which is what the trial court, in many instances, did in this case. In addition to making findings of fact that recited the testimony of various witnesses, the trial court made findings of fact that resolved a number of material disputes in the record evidence by stating that the children were previously adjudicated neglected juveniles on the basis of a consent order signed by respondent-mother and respondent-father and that respondent-mother and respondent-father had "stipulated the juvenile[s] [were] neglected juvenile[s], in that the juvenile[s] did live in an environment injurious due to the conditions of the home, including a roach infestation, unsanitary conditions of the home and hygiene of the juvenile[s]"; the juveniles did not receive proper care from respondent-mother and respondent-father; that respondent-mother and respondent-father "show[ed] a pattern of neglect and a failure to understand the need to change diapers, keep the home and the juvenile[s] clean, and keep themselves clean"; that respondent-mother and respondent-father did not appear to believe that there were any problems that they needed to address; that, while the level of sanitation in the family home appeared to have improved, there was "no indication of acceptance that there was a problem that needed addressing to begin with"; that respondent-father continued to assert that the children did not have special needs despite being provided with documents indicating that the children's alleged needs were genuine; that the care

that respondent-mother provided for the children was insufficient; and that respondent-father had failed to provide the children with consistent care. As a result, these findings of fact are appropriately considered in evaluating the lawfulness of the trial court's termination orders.

¶ 19 In addition, respondent-father argues that Finding of Fact Nos. 15, 21, and 24–27 in the termination orders relating to Jake and Evette and Finding of Fact Nos. 15, 21–22, and 25–28 in the termination order relating to Alana are nothing more than mere recitations of portions of the record. As far as Finding of Fact Nos. 15 and 24 in Jake's and Evette's termination orders and Finding of Fact Nos. 15 and 25 in Alana's termination order are concerned, "the trial court in this case relied partly on evidence from prior proceedings and findings in earlier orders, which . . . is proper and appropriate." *In re T.N.H.*, 372 N.C. at 408.

¶ 20 In *In re T.N.H.*, the mother argued that certain findings "were improper because they merely recite prior allegations, describe what various people not in court, or unidentified, believed about certain events, and do not meet the standard for evidentiary findings sufficient to support conclusions of law." *Id.* In rejecting this argument, we noted that:

> A trial court may take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard because where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence. *Munchak Corp. v. Caldwell,*

301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981). As this Court has stated:

> [E]vidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect.
>
> *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). We agree with the Court of Appeals' precedent holding that the trial court may not rely solely on prior court orders and reports but must receive some oral testimony at the hearing and make an independent determination regarding the evidence presented. *In re A.M., J.M.*, 192 N.C. App. 538, 541–42, 665 S.E.2d 534, 536 (2008), *appeal after remand*, 201 N.C. App. 159, 688 S.E.2d 118 (2009) (unpublished).

*Id.* (alteration in original). After noting that the trial court had taken judicial notice of certain orders upon which it had relied in making the challenged findings of fact and that "the social worker assigned to the case testified at the hearing regarding" the subject matter of the findings, we held that "[t]he trial court's findings of fact appear to be based, at least in part, on testimony provided at the hearing, sufficient to demonstrate that the trial court made an independent determination regarding the evidence presented." *Id.* The same is true of Finding of Fact No. 15 in the termination orders relating to all three juveniles, to Finding of Fact Nos. 24 and 27 in the termination orders relating to Jake and Evette, and to Finding of Fact Nos. 25

and 28 in the termination order relating to Alana, all of which described what the social worker did, what DSS had determined, and what the trial court had previously found or concluded.

¶ 21        The trial court took judicial notice of the findings of fact and orders in the adjudication orders that were entered relating to all three children. In Finding of Fact No. 15 in all three adjudication orders, the trial court found that, following the receipt of the child protective services report, a social worker noted that the home had "roaches throughout[,] . . . a pile of dirty diapers at the door[,] . . . [and] trash and food debris scattered around the home." This finding rested upon the findings that had been made in prior orders in the underlying neglect proceeding that were incorporated into reports submitted by DSS and the guardian ad litem. The reports submitted by DSS and the guardian ad litem detailed the conditions found in the home and the investigating social worker described these conditions at the termination hearing, during which she testified that she had personally observed roaches throughout the home, a pile of dirty diapers within reach of the children, food scattered throughout the home in the vicinity of roaches, and plates of food and leftover pans in the kitchen.

¶ 22        Similarly, in Finding of Fact No. 24 in the termination order relating to Jake and Evette and Finding of Fact No. 25 in the termination order relating to Alana, the trial court found that DSS had discovered that the juveniles had significant needs,

that there were concerns about the nutrition that the juveniles were receiving, and that the juveniles had tested positive for the presence of high levels of lead. As was the case with the findings discussed in the immediately preceding paragraph, the challenged trial court findings rely upon orders that the trial court entered during the underlying neglect proceeding that, in turn, relied upon the DSS and guardian ad litem reports that detailed the relevant +information. In addition, the trial court did not place sole reliance upon these reports given that the social worker testified that her investigation of the medical records led to concerns about the quality of the nutrition provided in the home, which included sugary drinks and limited food choices, and that Jake and Ellie had tested positive for high levels of lead exposure. Similarly, another social worker testified that Jake had been diagnosed with a chromosomal issue that mimicked autism; that Evette had medical and developmental issues, including a hernia and speech difficulties, that needed to be addressed by the parents; that Alana had developed dental problems at four months of age; and that Ellie had experienced global delays in kindergarten, had an extensive IEP, and had failed kindergarten.

¶ 23    Respondent-father also argues that Finding of Fact No. 27 in the termination orders relating to Jake and Evette and Finding of Fact No. 28 in the termination order relating to Alana constituted mere recitations of record information. In the challenged findings, the trial court stated that it previously found in the underlying

neglect proceeding, following a hearing held on 17 May 2019, that respondent-father did not believe that Jake needed the recommended therapies and expressed a need to go to work. Once again, the relevant finding is a reference to a prior order rather than a mere recitation of record evidence. *In re T.N.H.*, at 408. In a permanency planning order dated 11 July 2019, the trial court found that respondent-father participated in an IEP meeting relating to Jake by phone and stated that he did not believe that Jake needed the services that were being recommended and that respondent-father needed to get to work. In addition, a social worker testified that respondent-father had participated in an IEP meeting relating to Jake by phone, respondent-father had previously testified that Jake's speech delays did not pose a problem, and another witness described respondent-father's focus upon his work rather than upon the children's needs.

¶ 24     As a result, the record reflects that, in making each of the challenged findings, the trial court did not rely solely upon prior orders and reports and, instead, also heard live testimony from witnesses at the termination hearing. "The trial court's findings of fact appear to be based, at least in part, on testimony provided at the hearing" and are "sufficient to demonstrate that the trial court made an independent determination regarding the evidence presented." *Id.* at 410. Moreover, the challenged findings of fact, rather than merely reciting portions of the record evidence, simply acknowledge what a social worker observed, what DSS had

determined, and what the trial court had previously found or concluded. Thus, we hold that respondent-father's challenge to these findings lacks merit. *See also In re J.M.J.-J*, 374 N.C. 553, 558 (2020).

Finally, respondent-father's argument to the contrary notwithstanding, Finding of Fact Nos. 21, 25 and 26 in the termination orders relating to Jake and Evette and Finding of Fact Nos. 21, 22, 26 and 27 in the termination orders relating to Alana are not mere recitations of the testimony of various witness or other items of evidence admitted at the termination hearing and, instead, constitute findings made by the trial court based upon its consideration of the evidence. *In re Appeal of Harris Teeter, LLC*, 271 N.C. App. 589, 611 (2020) (stating that "[a] finding of fact is a 'determination reached through logical reasoning from the evidentiary facts'") (quoting *Barnette v. Lowe's Home Ctrs., Inc.*, 247 N.C. App. 1, 6 (2016))), *aff'd*, 2021-NCSC-80 (2021). As a result, respondent-father's challenge to these findings of fact lacks merit.

b. *Evidence Provided by Dr. Bennett*

In his next challenge to the trial court's termination orders, respondent-father asserts that the majority of the trial court's remaining findings of fact either lack sufficient evidentiary support or are excessively imprecise. As an initial matter, respondent-father challenges Finding of Fact Nos. 21 and 40 in the termination orders relating to Jake and Evette and Finding of Fact Nos. 21 and 41 in the

termination order relating to Alana, which discuss the psychological evaluation given to respondent-mother by Dr. Bennett in 2014. According to respondent-father, the 2014 evaluation was so remote in time as to be irrelevant, with respondent-mother having been under no obligation to comply with any DSS recommendation in 2014. For that reason, respondent-father urges us to exclude the relevant findings from our evaluation of the lawfulness of the trial court's termination orders. However, since the challenged findings of fact relate to respondent-mother rather than to respondent-father, they have no bearing upon the validity of respondent-father's challenge to the trial court's termination orders. As a result, we decline to address the validity of this aspect of respondent-father's challenge to the trial court's termination orders. *See In re T.N.H.*, 372 N.C. at 407 (stating that "we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights").

¶ 27        In addition, respondent-father argues, with respect to his own evaluation by Dr. Bennett in 2018, that any "findings that state or imply [the] report was valid are erroneous" given that Dr. Bennett's "conclusions, answers to questions, and recommendations derive from a gross misunderstanding of the relevant facts." After excluding the portions of the challenged findings that we have already addressed in the earlier portions of this opinion, it appears that this aspect of respondent-father's

argument involves two findings of fact. First, he challenges Finding of Fact No. 20 in all three of the relevant termination orders, which provides:

> That the juvenile was adjudicated neglected via a consent order signed by the mother and putative father on March 22nd, 2018. The mother and putative father stipulated that the juvenile was a neglected juvenile, in that the juvenile did live in an environment injurious due to the conditions of the home, including a roach infestation, unsanitary conditions of the home and hygiene of the juvenile. The juvenile did not receive proper care by the parents.

Although respondent-father attacks this finding as resting upon a failure on the part of Dr. Bennett to understand the relevant facts, it makes no mention of Dr. Bennett and is fully supported by the record evidence. The children were adjudicated to be neglected juveniles by means of a stipulation into which respondent-mother and respondent-father entered on 22 March 2018 and which stated that the juveniles "did not receive proper care, supervision, or discipline from" respondent-mother and respondent-father and that respondent-mother and respondent-father waived the presentation of evidence in support of the stipulation. The trial court took judicial notice of this stipulation, *see In re Ordinance of Annexation No. 1977-4*, 296 N.C. 1, 14 (1978) (stating that "stipulations constitute judicial admissions binding on the parties and dispense with the necessity of proving the stipulated fact" and "continue in force for the duration of the controversy and preclude the later assertion of a position inconsistent therewith"), in the 11 May 2018 adjudication order, in which the trial court stated that:

> [Respondent-mother and respondent-father], through their respective counsel, acknowledge the children are neglected juveniles, as they were in an environment injurious due to the conditions of the home, including a roach infestation, unsanitary conditions of the home and hygiene of the children. The children did not receive proper care by the parents.

*See In re Ballard*, 311 N.C. 708, 715 (1984) (stating that "evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect— is admissible in subsequent proceedings to terminate parental rights"). In view of the fact that "respondent[-father] did not appeal from the trial court's adjudication order," he "is bound by the doctrine of collateral estoppel from re-litigating these findings of fact." *In re T.N.H.*, 372 N.C. at 409 (citing *King v. Grindstaff*, 284 N.C. 348, 356 (1973) (stating that, in accordance with the doctrine of collateral estoppel, parties "are precluded from retrying fully litigated issues that were decided in any prior determination and were necessary to the prior determination")).

¶ 28        Similarly, respondent-father challenges the trial court's finding in all three termination orders that "[r]ecommendations were also made to the putative father by Dr. Bennett in 2018 through a Psychological Evaluation." According to respondent-father, Dr. Bennett was under the impression that, in April 2018, respondent-father and respondent-mother still lived in filthy conditions and had made no progress toward improving the condition of their home environment. Assuming, without in any way deciding, that respondent-father's factual assertions are valid, they have

little bearing upon the issue of whether Dr. Bennett made recommendations relating to respondent-father in a 2018 psychological evaluation. Furthermore, Dr. Bennett testified that he evaluated respondent-father in 2018, with the report that he prepared at the time of this evaluation having been admitted into evidence. Dr. Bennett's report recommended that respondent-father participate in parenting classes, ensure that the children receive safe and adequate care in his care, and maintain a home that was safe and did not pose a health hazard. As a result, we conclude that the challenged finding has ample evidentiary support.

¶ 29        In contending that the trial court should have refrained from considering Dr. Bennett's report in its entirety, respondent-father points to the presence of a note at the end of Dr. Bennett's report stating that respondent-father was with respondent-mother "when her children were removed in 2014" while arguing that no "removal" had occurred at that time. In the same vein, respondent-father claims that Dr. Bennett was not aware that respondent-father and respondent-mother had kept the home in a cleaner condition from the spring of 2018 until the date of the hearing. Upon being asked whether Ellie had been removed from respondent-mother's and respondent-father's care in 2014 after respondent-mother had left the child in the car for approximately fourteen minutes during ninety degree weather, Dr. Bennett testified that "I don't see that I've made a notation that [DSS] had custody. So, no, I — I don't think I knew that at that time." As a result, given that Dr. Bennett denied

any knowledge that Ellie had been removed from the care of respondent-mother and respondent-father in 2014, we do not believe that the inclusion of a single erroneous phrase precluded the trial court from relying upon other portions of Dr. Bennett's report in deciding the issues that were before it in this case.

¶ 30        Similarly, respondent-father notes that he and respondent-mother were just "making progress on removing the roaches and cleaning their home" on 22 March 2018 and had begun to keep their house clean beginning in "the spring of 2018[.]"  In view of the fact that the progress that respondent-mother and respondent-father had made in connection with the cleanliness of their home had just begun at the time of Dr. Bennett's report, the record evidence tends to show that Dr. Bennett's report does not reflect a misunderstanding of the issues that needed to be addressed by respondent-mother and respondent-father or the status of the home at the time that he conducted his evaluation.   At the hearing, Dr. Bennett was asked multiple questions in which he was requested to assume that respondent-mother and respondent-father had been able to keep their home clean from April 2018 to the date of the termination hearing.   In answering these questions, Dr. Bennett stated, that "it ha[d] been almost three years since I'd seen them.  So that for me would be — is if that home ha[d] been reasonably clean for those three years, then that would for me say, well, it sounds like they are able to do that," and that, "if it's been clean for three years, then that would suggest that they had succeeded."  Thus, the record reflects

that Dr. Bennett fully considered the possibility that respondent-mother's and respondent-father's ability to maintain their home in a clean and sanitary condition had improved and that, even considering this factor, he "still ha[d] concerns about the capacity to parent" and that he "would have real reservations about their ability to" parent the children. As a result, the trial court did not err in considering Dr. Bennett's report and the testimony that he provided at the termination hearing.

### c.  *Other Findings*

In his remaining challenges to the trial court's findings, respondent-father argues that the record does not support the findings in the termination orders relating to Jake, Evette, and Alana that he "did not complete parenting classes which were recommended by Dr. Bennett and Dr. Holm."[5] In view of the fact that a social worker testified that, despite the absence of any supporting records in the file, she understood that both respondent-mother and respondent-father had completed parenting classes and the fact that the reports that both DSS and the guardian ad litem had prepared for an 11 April 2019 hearing stated that respondent-father had

---

[5] Respondent-father also claims that the findings contained in all three termination orders relating to respondent-mother's failure to complete parenting classes and to attend "any therapies" for the juveniles and the trial court's findings that respondent-mother's caregiving had been insufficient and that she did not feel that there were issues that needed to be addressed lack sufficient evidentiary support. In light of the fact that these findings have no bearing upon the termination of respondent-father's parental rights, we will review them in the course of addressing respondent-mother's appeal. *See In re T.N.H.*, 372 N.C. 408, 407 (2019) (stating that "we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights").

completed parenting classes, we conclude that respondent-father's contention to this effect has merit. As a result, we will disregard this finding in determining whether the trial court erred by determining that respondent-father's parental rights were subject to termination. *See In re N.G.*, 374 N.C. 891, 901 (2020) (disregarding findings of fact not supported by clear, cogent, and convincing evidence).

¶ 32        In addition, respondent-father argues that the trial court erred by finding that he "ha[d] not attended any therapies." Once again, we agree that respondent-father's contention has merit. A social worker testified that, in May 2019, DSS was instructed to give respondent-mother and respondent-father the contact information for each of the children's medical providers and that she attempted to comply with this instruction. Although the record does not reflect the number of appointments that respondent-father and respondent-mother actually attended, a DSS report prepared in advance of the 12 September 2019 review hearing stated that respondent-father had routinely attended Evette's speech therapy appointments and that respondent-father had attended one of Alana's dental appointments and a swallow test for Evette before stating that respondent-father "has not called or participated with any other appointments or sessions regarding these two or any other children." The permanency planning order entered on 11 October 2019, which incorporated the related DSS report into its findings of fact, found that respondent-father had attended the appointments listed above while having failed to attend numerous other

appointments. As a result, since the record evidence does not support the trial court's finding that respondent-father had failed to attend "any" therapies, we will disregard the trial court's findings to that effect in determining whether respondent-father's parental rights in the children were subject to termination. *See id.*

¶ 33 Next, respondent-father challenges the trial court's finding, which appears in all three termination orders, that, when DSS became involved with the family, there were "concerns with the juvenile testing positive for high levels of lead." In respondent-father's view, the record does not contain any evidence tending to show that "all juveniles tested positive for high levels of lead." Although a social worker testified that Jake and Ellie had tested positive for high levels of lead, there is no similar evidence relating to Evette and Alana. As a result, we will disregard any finding that the trial court might have made to the effect that Evette and Alana had tested positive for high levels of lead in determining whether the trial court correctly determined that respondent-father's parental rights in the children were subject to termination. *See id.*

¶ 34 Similarly, respondent-father argues that the trial court erred by making Finding of Fact No 35 in the termination orders relating to Jake and Evette and Finding of Fact No. 36 in the termination order relating to Alana, which state that "there appears to be an improvement in the sanitation of the home as evidenced by the photos submitted into evidence" on the grounds that the challenged findings

"misstate[ ] the record" given that "every order entered . . . since the spring of 2018 [found] that the parents had corrected the conditions in the home." Aside from our inability to understand why respondent-father would challenge a finding of fact that indicated that the sanitation in the home had improved, his own characterization of the record supports, rather than undercuts, the challenged findings. A social worker testified that respondent-father and respondent-mother cooperated with the exterminator and that, when the social worker visited the home in September 2019, she discovered that, while the exterior of the home showed the presence of clutter, the inside was "free from trash and waste products," with the photographs that were admitted into evidence tending to support this assertion. As a result, the challenged findings of fact have sufficient evidentiary support.

¶ 35        Furthermore, respondent-father argues that the trial court's finding that "there is still no indication of acceptance that there was a problem that needed addressing to begin with" is only supported by psychological reports "which are based on erroneous information." As we have already noted, the record reflects that Dr. Bennett, a psychologist who has done parenting capacity evaluations for ten to twenty years, evaluated respondent-father in 2018. After being qualified as an expert in psychology and conducting parenting capacity evaluations, Dr. Bennett testified that respondent-father believed that "there was really no problem[,]" that DSS was picking on him and unfairly interfering in his life, that the situation was being

exaggerated, and that everything was fine. Dr. Bennett described respondent-father as "someone who did not seem to recognize the seriousness of the condition that DSS was . . . reporting," who was not focused on the conditions in his home, and who did not think that those conditions were unsafe or unsanitary. Dr. Bennett stated that, while most parents whom he evaluates initially believe that there is no reason for them to be seeing him, at some point they recognize that "they need to make some changes because whatever was happening was harming a child," while, on the other hand, respondent-mother and respondent-father continued to minimize the gravity of the situation that the children faced and had an attitude of "it's not that bad," "our kids are fine[,]" "[w]e're doing fine[,]" "[s]tay out of my life." Finally, Dr. Bennett testified that respondent-father did not believe that either he or respondent-mother had done anything worthy of DSS involvement. In the same vein, a social worker who had interacted with respondent-father and respondent-mother before and after the children's removal from the home testified that neither parent appeared to understand DSS' concerns with the condition of the home, stating that respondent-father "often minimized the conditions of the home and wouldn't take responsibility." As a result, the record evidence fully supports the challenged finding.

¶ 36          Moreover, respondent-father argues that certain of the trial court's findings of fact, "to the extent they describe a condition or belief that has endured over time or existed at the termination hearing," lack sufficient evidentiary support on the theory

that the "evidence does not support the findings to the extent they attempt to describe conditions or views that existed after the spring of 2018." For example, respondent-father challenges the finding contained in all three termination orders that respondent-mother and respondent-father "have shown a pattern of neglect and a failure to understand the need to change diapers, keep the home and the juvenile clean, and keep themselves clean." However, a social worker described the existence of a problem stemming from a failure to change diapers in a timely manner, both in 2014 and in 2018. In addition, the social worker testified that the home occupied by respondent-mother and respondent-father was dirty in both 2014 and 2018. Finally, two social workers and Dr. Bennett described the level of hygiene maintained by respondent-mother and respondent-father during the initial investigation in 2018, at the time of Dr. Bennett's evaluation, and during more recent interactions that began in March of 2019 and continued during visitation sessions and other face-to-face meetings. As a result, the record contains sufficient evidence to support the challenged findings of fact. *See In re J.O.D.*, 374 N.C. 797, 806 (2020) (stating that, "[a]lthough there was record evidence that would have supported a contrary decision, 'this Court lacks the authority to reweigh the evidence that was before the trial court' " (quoting *In re A.U.D.*, 373 N.C. at 12)); *In re T.N.H.*, 372 N.C. at 411 (recognizing that it is the trial court's "duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn

from the testimony"); *In re Montgomery*, 311 N.C. at 110–11 (stating that "our appellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary").

¶ 37        The next challenged finding, which appears in all three termination orders, states that respondent-father "has failed to provide consistent care with respect to the juvenile." Respondent-father contends that this finding lacks sufficient evidentiary support to the extent that it purports to describe conditions that continued beyond the spring of 2018. As we have already noted, however, a social worker described the conditions that existed in the home in 2018 as including the presence of "roaches throughout[,] . . . a pile of dirty diapers at the door[,] . . . [and] trash and food debris scattered around the home." In addition, respondent-mother and respondent-father stipulated that the juveniles "did not receive proper care, supervision, or discipline from" them at the time that the juvenile petitions were filed in the underlying neglect and dependency proceeding. Similarly, Dr. Bennett testified that respondent-father did not believe that any unsafe or unsanitary conditions existed in the family home, that he believed that he and respondent-mother were being unfairly targeted by DSS, that respondent-father did not recognize the seriousness of the conditions that the family faced and was not focused upon resolving them, that respondent-father was not the primary "or even a real active

parent," and that respondent-father left the actual parenting to respondent-mother even though the children were not safe in her care. Furthermore, Dr. Bennett did not believe that respondent-father could create an environment for appropriate child development, that he could care for the children's needs, that the children were safe in his care, or that he understood the health risks of the living environment. After hearing the testimony at the termination hearing, Dr. Bennett opined that he still believed that it was unlikely that respondent-mother and respondent-father could successfully parent the children in light of several of the children's special needs and their limited parenting capabilities.

¶ 38       The concerns that Dr. Bennett expressed were supported by the testimony of other witnesses. At the termination hearing, a social worker testified that respondent-father minimized the conditions in the home and did not take them seriously. Another social worker testified that respondent-mother and respondent-father had not completed all aspects of their care plans, having fallen short in the areas of hygiene, the ability to demonstrate parenting skills, and maintaining consistent communication with DSS. *See In re M.A.*, 2021-NCSC-99, ¶ 32 (stating that "[a] parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect" (quoting *In re M.A.*, 374 N.C. 865, 870 (2020))). The social worker testified that, even though respondent-mother took the lead during visits, her skills were minimal, she could not handle all four children simultaneously, and she

tended to ask the visitation worker what to do or hand a child off to the visitation worker during difficult situations even though respondent-father was present. The social worker also testified that, if a visitation worker made any suggestions to respondent-mother or respondent-father, they would argue with the visitation worker.

¶ 39        According to the social worker, during one visit, respondent-father "got very frustrated with [Jake], and very loudly in a crowded park was like I've had enough of this to the point where in this crowded park everybody's head turned," leading to respondent-mother's intervention. According to the social worker, there had been "a number of issues during the visits[,]" including the fact that respondent-mother and respondent-father could not manage all four children, resulting in a decision to limit future visits to two children; the fact that, when all four children were in attendance, two supervisors needed to be present as well; the fact that, invariably, one of the children would be left out during the visits; the fact that respondent-father showed a preference for one child over the others; the fact that respondent-mother and respondent-father spoke about the case during visits; the fact that, when Ellie referred to her foster mother as "mom" or "mommy" during a visit, respondent-mother and respondent-father got upset, with respondent-father having told Ellie that he would "bust [her] butt" if she called the foster mother "mommy" again; that, when the visitation worker addressed his conduct, respondent-father "started yelling at the

visitation worker that he didn't care" and that "[h]e was gonna do what he needed to do" and "say what he wanted to say" to Ellie; and that respondent-father would argue with visitation workers and refuse to comply when redirected during visits. The social worker testified that, at the time of the hearing, respondent-mother and respondent-father had not demonstrated the existence of the ability to parent consistently, any interest in learning what it would take to parent the children, the ability to parent the four children at the same time, or a desire to do what needed to be done for the children and to make them a priority. As a result, for all of these reasons, the record evidence amply supports the trial court's findings that respondent-father failed to provide consistent care to Jake, Evette, and Alana and that the pattern of neglect that existed at the time that the children were removed from the family home had continued to the time of the termination hearing, so that this aspect of respondent-father's challenge to the trial court's termination orders has no merit.

¶ 40        In addition, respondent-father argues that the record did not support the trial court's findings that he did not believe that the juveniles had special needs, that he "does not appear to feel that there are any issues that need to be addressed[,]" and that "there is still no indication of acceptance that there was a problem that needed addressing to begin with" "to the extent they describe a condition or belief that has endured over time or existed at the termination hearing." On the contrary, however,

respondent-father testified at a permanency planning hearing that Jake's speech was normal rather than delayed, with a social worker having described these comments at the termination hearing. In addition, as we have already noted, the trial court found in a permanency planning order entered on 11 July 2019 that, during an IEP meeting relating to Jake, respondent-father denied that Jake needed the proposed services before indicating that respondent-father needed to get to work. In the same vein, we also reiterate that Dr. Bennett and a social worker testified that respondent-father did not agree that the juveniles had any problems and believed, instead, that DSS was simply harassing the family. The challenged findings are also supported by the evidence concerning respondent-father's conduct during visits with the children, in which he refused to change his behavior when redirected by visitation workers and, instead, told them that he was going to act as he wished. As a result, the trial court reasonably inferred that respondent-father's failure to recognize the problems that had resulted in DSS intervention continued throughout the course of the underlying neglect and dependency proceeding and the termination of parental rights proceeding. *See In re J.O.D.*, 374 N.C. at 806; *In re T.N.H.*, 372 N.C. at 411; *In re Montgomery*, 311 N.C. at 110–11.

Next, respondent-father challenges the trial court's references to him as the "putative father" in the orders that the trial court entered during the underlying neglect and dependency proceeding and in Finding of Fact No. 43 in the portion of the

termination order relating to Jake, which stated that respondent-father had "never legitimated the juvenile" in the manner required by law or submitted to a DNA test. In view of the fact that this argument relates to the trial court's decision that respondent-father's parental rights in Jake were subject to termination based upon a failure to legitimate Jake pursuant to N.C.G.S. § 7B-1111(a)(5) and the fact that we have, for the reasons set forth below, elected to affirm the trial court's determination that respondent-father's parental rights in all of his children were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), we need not address this aspect of respondent-father's challenge to the trial court's termination orders given that "we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights[,]" *In re T.N.H.*, 372 N.C. at 407.

### 2. *Grounds for Termination*

¶ 42        In his final challenge to the trial court's termination orders, respondent-father argues that the trial court erred by concluding that his parental rights in Evette and Alana were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and dependency, N.C.G.S. § 7B-1111(a)(6), and that his parental rights in Jake were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1); failure to legitimate, N.C.G.S. § 7B-1111(a)(5); and dependency, N.C.G.S. § 7B-1111(a)(6). According to respondent-father, the trial court erred by concluding that his parental

rights in all three children were subject to termination on the basis of neglect given the absence of any evidence tending to show that, since the spring of 2018, the children were subject to any condition that placed them in an injurious environment or created a risk that they would be subject to improper care or supervision. Although respondent-father does not deny that he stipulated that his children were neglected juveniles in March 2018, he claims that the "undesirable conditions existing or arising from the date of removal to the termination hearing do not rise to the level of neglect" and that the trial court erred by concluding that a repetition of the neglect to which the children had been subjected was likely in the event that they were returned to his care. We do not find respondent-father's argument to be persuasive.

¶ 43       A trial court may terminate a parent's parental rights in a child based upon a determination that the parent has neglected that child. N.C.G.S. § 7B-1111(a)(1) (2019). A "neglected juvenile" is defined, in pertinent part, as one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). Although the trial court is entitled to terminate a parent's parental rights in a child in the event that neglect is currently occurring at the time of the termination hearing, *see, e.g., In re K.C.T.*, 375 N.C. 592, 599–600 (2020) (stating that "this Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment"), the

fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.*, 373 N.C. at 80 (quoting *In re L.O.K.*, 174 N.C. App. 426, 435 (2005)). In such circumstances, this Court has stated that "evidence of neglect by a parent prior to losing custody of a child — including an adjudication of such neglect — is admissible in subsequent proceedings to terminate parental rights"; however, "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. at 715. After weighing the relevant evidence, the trial court may conclude that the parent's parental rights in the child are subject to termination on the basis of neglect if it determines that the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841 (2020) (quoting *In re D.L.W.*, 368 N.C. 835, 843 (2016)). As a result, a parent's parental rights in a child may be subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) in the event that the trial court determines that the child has been neglected in the past and that there is a likelihood that the child will be neglected in the future if he or she is returned to the parent's care. *Id.* at 841.

¶ 44        According to respondent-father, the trial court's findings of fact do not support a determination that his parental rights in his children were subject to termination

on the basis of neglect given that the problems that led to the initial adjudication of neglect were resolved before the termination hearing, with the trial court having failed to give proper consideration to the changes in his circumstances and the progress that he had made towards reunification following the initial adjudication. As we have demonstrated in considerable detail above, however, the record contains ample evidence tending to show that the children, with the consent of both respondent-mother and respondent-father, were found to be neglected juveniles in May of 2018, and that (1) the children had significant needs; (2) respondent-mother and respondent-father exhibited "a pattern of neglect and a failure to understand the need to change diapers, keep the home and the juvenile[s] clean, and keep themselves clean"; (3) respondent-father continued to deny that the children had special needs even after having been presented with "evidence-based documentation"; (4) respondent-father did not believe that the family had any problems that needed to be addressed; (5) respondent-father failed to accept "that there was a problem that needed addressing to begin with"; (6) respondent-father left most of the parenting responsibilities to respondent-mother and never made any effort to assume responsibility for the performance of any parenting duties; and (7) respondent-father failed to provide consistent care for the juveniles. In our view, these findings fully support the trial court's determination that Jake, Evette, and Alana were neglected

juveniles and that the neglect that they had previously experienced was likely to reoccur in the event that they were to be returned to respondent-father's care.

¶ 45          In addition, respondent-father's contention to the contrary notwithstanding, the trial court's findings do not rest upon any misapprehension of the applicable law. For example, having found that "there appears to be an improvement in the sanitation of the home as evidenced by photos submitted into evidence," it is clear that the trial court did, in fact, consider the evidence concerning relevant circumstances up to and including the date of the termination hearing. In addition, we see no indication that the trial court failed to apply the appropriate standard of proof or acted on the basis of an understanding that it could not consider the evidence concerning the efforts at reunification that respondent-mother and respondent-father did make until the time of the termination hearing given that a social worker testified concerning the efforts that respondent-mother and respondent-father made in attempting to satisfy the requirements of their case plans and given that the trial court made a specific finding that the level of sanitation in the family home had improved. As a result, the trial court did not err by concluding that respondent-father's parental rights were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1).

**B. Respondent-mother's arguments**

¶ 46        In her own challenge to the trial court's termination orders, respondent-mother begins by arguing that several of the trial court's findings of fact constitute mere recitations of the testimony of various witnesses or the contents of various reports, with these arguments being directed to Finding of Fact Nos. 15–18 in the termination orders relating to all four children, Finding of Fact No. 22 in the termination order relating to Ellie, Finding of Fact Nos. 22–23 in the termination orders relating to Jake and Evette, and Finding of Fact Nos. 23–24 in the termination order relating to Alana.  We have already addressed Finding of Fact Nos. 15–18 in the orders regarding Jake, Evette, and Alana in addressing respondent-father's challenge to the lawfulness of the trial court's termination orders, with the determinations that we made in connection with respondent-father's appeal being equally applicable to the same findings challenged in respondent-mother's appeal.  Similarly, and for the same reasons that we gave in connection with our consideration of respondent-father's appeal, we conclude that, while Finding of Fact No. 15 in the order relating to Ellie was not improper, Finding of Fact Nos. 16–18 in the order relating to Ellie should be disregarded in determining whether respondent-mother's parental rights in that child were subject to termination.  In the same vein, having determined that Finding of Fact No. 23 in the termination orders relating to Jake, Evette, and Alana; Finding of Fact No. 24 in the order relating to Alana; and Finding of Fact No. 22 in the orders relating to Jake and Evette were improperly made with respect to respondent-father,

the same is equally true with respect to respondent-mother. Finally, for the reasons stated above, we also conclude that Finding of Fact No. 22 in the termination order relating to Ellie was improperly made and will disregard it in the course of determining whether respondent-mother's parental rights were subject to termination.

¶ 47        Next, respondent-mother challenges the sufficiency of the evidentiary support for several of the trial court's findings of fact. First, respondent-mother challenges the sufficiency of the evidentiary support for the finding of fact contained in all four termination orders that "[t]he mother and . . . father have shown a pattern of neglect and a failure to understand the need to change diapers, keep the home and the juvenile clean, and keep themselves clean." In addition to the evidence that we relied upon in rejecting respondent-father's challenge to this finding, we note that the record also contains evidence tending to show that respondent-mother exhibited a pattern of "fail[ing] to understand" the need to address problems relating to the sanitary conditions in the home given that she did not see these conditions as problematic to begin with. In addition, a social worker and Dr. Bennett, who evaluated respondent-mother in 2014 and 2018, both testified that respondent-mother's intellectual limitations resulted in a lack of understanding of the parenting skills that DSS had attempted to teach her.

¶ 48        Dr. Bennett, whose 2014 evaluation of respondent-mother occurred in the aftermath of the incident in which she left Ellie alone in a car for approximately fourteen minutes on a ninety-degree day, testified that respondent-mother denied the existence of any problems in the family, failed to understand the issues that had led to her referral to Dr. Bennett, and thought that DSS was treating her unfairly. Furthermore, Dr. Bennett testified that respondent-mother did not appear to understand child development, that people were attempting to teach her parenting skills that were not being learned, and that respondent-mother's attitude was, " 'Why are you bugging me?  I'm doing okay.'  There's not really a problem."  Dr. Bennett further stated that he did not, in 2014, "see evidence that she exercises the judgment and the understanding of — of child development and of safety to keep the children safe" and that he "was concerned that — that she did not have that."  Dr. Bennett found that respondent-mother did not understand the need to proactively address problems arising from dealing with dirty diapers, the problems that could result from isolating a child in a car seat or playpen, and the difficulties that could result from a failure to address a child's developmental delays.  In conclusion, Dr. Bennett testified that, "if you don't believe that there's a problem, you're not going to put the effort into it because why."

¶ 49        Dr. Bennett expressed similar concerns following the evaluation that he conducted with respect to respondent-mother in 2018.  At that time, Dr. Bennett

concluded that respondent-mother did not understand the severity of the conditions that existed in the home and had not learned anything from the experiences that she had had in 2014. Dr. Bennett testified that, as was the case in 2014, respondent-mother lacked the ability to create an appropriate environment for the children, the children were not safe in her exclusive care, and she did not understand the health risks that resulted from the maintenance of an environment like the one that existed in the family home. According to Dr. Bennett, respondent-mother was effectively saying, "I don't understand. You guys are kind of — this is unfair. We're — we're doing okay. You know, stay out of my life. I just [don't] see that she was even aware that — that the environment was that bad." Based upon this evidence, we hold that the challenged finding of fact has ample evidentiary support with respect to all four children. *See In re J.O.D.*, 374 N.C. at 806; *In re T.N.H.*, 372 N.C. at 411; *In re Montgomery*, 311 N.C. at 110–11.

¶ 50        In addition, respondent-mother challenges the findings of fact that appear in the termination orders relating to all four children that she did not complete parenting classes and has not attended any classes or therapies. A social worker testified that respondent-mother and respondent-father completed parenting classes, and the record evidence establishes that respondent-mother attended some of the children's medical appointments, while missing others. Having concluded in connection with respondent-father's appeal that these findings, at least in part,

lacked sufficient evidentiary support, we reach the same result with respect to respondent-mother.

¶ 51        Similarly, respondent-mother, like respondent-father, challenges the sufficiency of the evidentiary support for the findings, which appear in all four termination orders, that respondent-mother "does not appear to feel that there are any issues that need to be addressed" and that there "is still no indication of acceptance that there was a problem that needed addressing to begin with." Having held that these findings had ample evidentiary support in addressing respondent-father's appeal, we reach the same result with respect to respondent-mother, particularly given Dr. Bennett's testimony that respondent-mother failed to comprehend that the family faced significant difficulties that needed to be addressed.

¶ 52        Finally, respondent-mother challenges the finding of fact contained in all four termination orders to the effect that her caregiving skills and efforts had been insufficient. As we have already discussed in our consideration of the similar challenge that respondent-father has directed to these findings of fact, the record, including, but not limited to, the testimony of Dr. Bennett, provides ample support for these findings as well.

¶ 53        The record reflects that respondent-mother left Ellie in a hot car in 2014. A subsequent investigation revealed the existence of problems relating to the cleanliness of and level of sanitation in the family home. However, according to Dr.

Bennett, respondent-mother did not acknowledge the existence of the problems that were pointed out to her on that occasion and failed to learn anything from the remedial services that were offered to her at that time. The condition of the family home continued to be very poor in 2018, as was reflected by the existence of a roach infestation and a collection of unaddressed dirty diapers. Even so, respondent-mother continued to fail to recognize the existence of these problems and felt, instead, that DSS was unfairly interfering in her life. According to Dr. Bennett, respondent-mother had the same parenting deficiencies in 2018 that she had had in 2014, having learned nothing from her prior experience. In addition, respondent-mother failed to take care of herself, suffered from untreated depression, was easily taken advantage of, allowed a sex offender to live in her home, and failed to understand child development or how to create an appropriate home environment for the children.

¶ 54       Finally, a social worker described respondent-mother's failure to satisfy the requirements of her case plan with respect to issues relating to hygiene, parenting skills, and the need for regular communication with DSS and the deficient parenting skills that respondent-mother exhibited during visitation sessions with the children, during which she demonstrated an inability to care for all four children even when respondent-father was present. The social worker further testified that she had not seen any desire on the part of respondent-mother to learn improved parenting skills, with Dr. Bennett having testified that it was unlikely that respondent-mother and

respondent-father could develop the ability to parent the children if the children were returned to their care. As a result, these findings have ample evidentiary support as well.

¶ 55       As was the case with respect to respondent-father, respondent-mother acknowledges that the children had previously been found to be neglected juveniles. Instead, she argues that the trial court erred by concluding that the children were likely to experience a repetition of neglect in the event that they were returned to her care. As we have already explained in connection with respondent-father's appeal, however, the trial court's findings fully support its determination that the neglect that the children had experienced would likely be repeated in the event that the children were returned to respondent-mother's care. In its termination orders, the trial court found that (1) the children were previously adjudicated as neglected juveniles with the consent of respondent-mother and respondent-father; (2) the juveniles had significant needs; (3) respondent-mother, like respondent-father, showed "a pattern of neglect and a failure to understand the need to change diapers, keep the home and the juvenile[s] clean, and keep themselves clean"; (4) respondent-mother did not feel that the family had any problems that needed to be addressed; (5) respondent-mother did not accept "that there was a problem that needed addressing to begin with"; (6) respondent-mother did not understand that there had been problems that needed addressing in 2014 and that, "by the time the 2018

psychological evaluation occurred[,] she still did not seem to understand that any problem needed addressing"; and (7) respondent-mother lacked sufficient caregiving skills. As a result, we hold that the trial court did not err in determining that respondent-mother's parental rights in all four children were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

### III. Conclusion

Thus, for the reasons set forth above, we hold that the trial court did not err by determining that the parental rights of respondent-mother and respondent-father in Ellie, Jake, Evette, and Alana were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1). In view of the fact that the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, *see In re A.R.A.*, 373 N.C. 190, 194 (2019), we need not address the challenges that have been advanced by respondent-mother and respondent-father to the other grounds for termination that the trial court found to exist in this case. Finally, since neither respondent-mother nor respondent-father has advanced any challenge to the trial court's dispositional decision before this Court, we affirm the trial court's termination orders.

AFFIRMED.